for the whole Government, on the 22nd and the 2nd of this month in the Philadelphia District millimeters Morning. May it please the Court, George Rule on behalf of the Appellant Reza Yazdian. I'd like to reserve three minutes of my time for rebuttal. The evidence in this case is that he had good performance reviews throughout the history of his performance, and for five years there were no disciplinary actions of any kind. He had received a promotion in 2008. It wasn't until early June of 2010 when he complained to his boss's boss that his supervisor, Tim Sweat, was discriminating against him and creating a hostile work environment, that that set in motion a series of events. Within the course of six weeks, Mr. Yazdian was written up for the first time in his career on July the 13th and fired 13 days later. Now ConMed admits that if you view the evidence in this record in the light most favorable to Mr. Yazdian, it's clear that he made a complaint to his boss that he didn't like his race, that he was creating a hostile work environment. He also made a complaint to his boss's boss that he was subjected to discrimination and that he was experiencing a hostile work environment, and he asked for a transfer. Now ConMed admits in its internal documents and emails that Mr. Yazdian raised these concerns about his race and a hostile work environment. Could I ask you one thing? I was a little confused about some of your client's allegations. He keeps referring to his race without explaining what that race is, and obviously he complains about discrimination that he alleges on the basis of his ethnicity and religion, but then there are all these references to race, and I'm at a loss to know what he's talking about there, since he never explains it. What race is he claiming that he belongs to, that he was discriminated on the basis of? Well, it's ethnic origin, his Iranian heritage. He was actually, he was born in the United States, but there's evidence throughout the case, and this goes to the discrimination claim, where Mr. Yazdian testified he felt like his supervisor was making digs at him for his Iranian origin and his Muslim religion. Okay, but for purposes of the lawsuit, is national origin, isn't national origin different from race under our case law and that kind of thing? I mean, is this really a, is this a race case, or is it not a race case? Well, it's race, but it's ethnic origin. So there is not, there's not a national origin claim, but it's Mr. Yazdian's Iranian heritage that he felt like was being assailed. What are the specific complaints of religious discrimination? Is it really this honey-baked ham? Is that part of it in terms of his Muslim background and not possibly consuming pork? What, there seems really to be, I guess, I thought maybe more race-related complaints than religious-related. Right, I mean, in terms of what he expressed as far as his protected activity, it was the comment to his supervisor that, I guess you don't like my race either, and... Would you say what race he is? He's, he's Caucasian. Okay. But it's, it's his Iranian heritage. He, Mr. Yazdian used the term, used the term race, but what, what caused his good-faith concern about, you know, Mr. Sweat has issues with who I am, my heritage, was just getting the National Geographic article out of the blue. I mean, there certainly did... Was there something, the first question is, is the National Geographic article in the record? Yes. Can we see it? Where is it in the record? It, I believe the, it is an exhibit to Mr. Yazdian's deposition. I'm not sure what volume he was deposed over two separate days, and I don't believe the copy of the cover page, which shows a Muslim, a Muslim woman. If you could make sure that the Sixth Circuit has the, whatever was introduced at the district court. I'm not asking you to go beyond what's in the record, but it, I could not find this, and it may just be, you know, difficulties on the court's end, as opposed to, but if you could just make sure that all, via the clerk's office, that whatever was in the district court record that we have, that would be great. Absolutely. And, and the argument is that the, that the provision of this article showed some sort of discriminatory animus based upon his Iranian heritage, because the article was that was his testimony, and it, it goes, Your Honor, to his, his good faith basis for why he was concerned that Mr., Mr. Sweat didn't like him because of his heritage. And, was there, was there anything negative about the article that, or does that not make a difference? Is it just the fact that he was singled out, given an article that related to his heritage, that is the discriminatory factor here? You know, I think the significance is how Mr. Yazdien felt about it. I'm not going to say it doesn't make a difference. Certainly, if it was an offensive article, that could have an impact on how a jury would, would view the evidence. You know, from my perspective, the retaliation claim is, is the much stronger of the two claims. As I recall the evidence, number one, Mr. Sweat gave, sent articles to a number of his employees, and he says that, you know, maybe these are facts that need to be hashed out in a, in a trial, who knows, but says that Mr. Yazdien was quite proud of his Iranian heritage, and he was simply providing the article, you know, for, you know, completely legitimate purposes. And, and that's true, and a fact finder certainly could interpret the evidence that way. You know, I think the, the fundamental mistake that the district court made in analyzing the case was not viewing the evidence in, under the totality of the case. It did not gauge, engage in protected activity. And if, and if you look at the court's opinion, really what, what the district court did was look at some of the comments that Mr. Yazdien made in the July 13th phone call in isolation, but didn't consider that in the context of what Mr. Yazdien had been doing prior to that. And that the, the key piece of protected activity that the district court ignored in its analysis was that early June phone call that Mr. Yazdien made to his boss's boss. Is this the phone call to Jackson? Scott Jackson, right. And Mr. Yazdien testified that he complained to Jackson about this, but we know at summary judgment, the evidence has to be viewed in the light most favorable to Mr. Yazdien. And he also asked for a transfer at that point in time. And I think if you, if you give Mr. Yazdien a fair reading of the evidence, I think it's, it's relatively clear that a jury could decide that he engaged in protected activity. So, so just so that I'm clear, the protected activity that you want us to focus on is the June 2010 phone call to Jackson. That's significant. I, I believe there was other instances of protected activity, but I think it's the most significant because that set, set a series of events in motion, which was the June 18th email to human resources where Sweatt gives his reasons for why he believes Yazdien has behavioral problems and is insubordinate. And I think you can look at that email and reasonably conclude that it's direct evidence of retaliatory intent because what Sweatt is characterizing as behavioral problems is Yazdien complaining to him, you don't like my race, and you're creating a hostile work environment. That's right there in the email. And you look at what happens from that and the testimony that flows from that, the human resources person admitted that that language in an email where an employee is saying to a supervisor, you're creating a hostile work environment, you don't like my race, that that's a red flag. Yet human resources didn't do anything to investigate Yazdien's allegations at that time, not until a month later after the termination decision was made. And in addition to that, the human resources didn't do anything to look at the underlying allegations that Mr. Sweatt was making this alleged history of behavioral problems. And that goes to the pretext argument, which is the district court dismissed causal connection and conflated that with pretext on the basis that Mr. Yazdien had this longstanding history of behavioral problems. There is certainly evidence in the record that rebuts that. It's his good performance review. If he was such a behavioral problem, why wasn't it reflected on his performance reviews? Why hadn't he received any prior disciplinary actions? And I think the court set the bar far too high with respect to the pretext standard. And what's important that the court got wrong, and this is actually clear from two recent decisions by Judge Clay, the Brewer v. New Era case and the Shazer v. Professional Transit Management case. And Judge Cole was on the panel as well, and those were decided last year, which is at summary judgment, Mr. Yazdien doesn't have to disprove their proffered reason for terminating him. All he has to do is to present evidence to rebut that proffered rationale. And this record clearly contains evidence from which a jury could say, you know, there's not, as a matter of law, a history of behavioral problems with respect to Mr. Yazdien. You know, I think this is a classic case of the court overstepping its bounds, deciding credibility issues in favor of the non-moving party. How does the sort of the temporal proximity play in here, in terms of the June 1 date and what happened after that that led to Mr. Yazdien's termination? I think it's significant. I mean, it's certainly based on the decisions of this court, anything inside of a few months. And you go from, you know, a call to his boss's boss in early June to, you know, six weeks later, somebody who's never been disciplined, somebody who's been promoted, somebody who's received awards to get fired. There's certainly temporal proximity in this case, but it goes well beyond that. It's Tim Sweat admitted that he made up his mind to fire Mr. Yazdien after that July 13 phone call. I mean, that's direct evidence of retaliation. This is not a summary judgment case. No, I know your time's out, but on the discrimination claim, where your client starts to have conflict with his supervisor and there's no direct evidence of overt discrimination, I guess we'd have to consider circumstantial evidence. How do we make the connection to the motivation being discriminatory based upon what seemingly is personality conflict where there's no interaction or discussion of race? I mean, the article and the baked ham gift, those things seem pretty innocuous in and of themselves. How do we make that connection? Yeah, I think it's a closer call, Your Honor. I think Mr. Yazdien can establish a prima facie case on the fourth prong based on the fact that he was replaced by someone outside his protected class. I mean, that's been part of the case law in this area for decades, that if an individual is replaced by someone outside the protected class. But I also don't want to dismiss, I think if you look at the article, the ham, you look at those in isolation, they seem trivial. I'm sorry I'm over my time, but I think the example at the award show and the difference between how Mr. Sweat treated Mr. Yazdien's colleague and Mr. Yazdien is telling. Both these guys thought they were going to get an award. He tells Mr. Yazdien's co-worker like three days before, hey, you're not going to get this award, and says to him, don't say anything to Reza about it. And then he waits until like 30 minutes before the awards are announced and says, oh, Reza, sorry, you're not going to get an award. Now, again, that might seem trivial, but it's disparate treatment. And you add all those things together. I mean, for Mr. Yazdien, it was a pattern of this kind of digs that made him think that, hey, he's treating me differently because of who I am. All right. Thank you. Thank you. Good morning, Your Honors. May it please the Court, my name is Laura Spring, and I represent ConMed, the defendant of Pelley. We believe that summary judgment should be affirmed in this matter because the district court correctly found no reasonable juror could find that ConMed terminated plaintiff because of his national origin and or religion or that ConMed retaliated against him. To your point, Judge Clay, I would like to raise that this is not a race case. The record is clear that Mr. Yazdien testified that he identifies himself as white, a Caucasian. And so we would submit that any allegation regarding his race is not at issue here. Is it a case of national origin? Well, his complaint states it's a case of national origin and or religion. He does identify himself as a Muslim and Iranian. So on the record, that's what's... Religion and national origin, presumably. That's what the record reflects. But to your point, we believe that this case is really about pretext and that Mr. Yazdien cannot point to anything in the record. There's no disputed facts here that would show that the reason for the termination was based on his national origin and or religion. We submit that his discrimination claim should be... The dismissal of his discrimination claim should be affirmed because he cannot produce any evidence on this record that his insubordinate behavior masked any sort of pretext. And that the retaliation claim that he could not establish a causal connection between his termination and any alleged complaints. Now, there was a lot of discovery in this case and a lot of back and forth between the parties as to the facts. But what we have before you now is a record that the facts aren't disputed. Mr. Yazdien has not disputed the facts of these statements that he's made. He does... The judge in the lower court did state that some of the statements he did not recall making. But as the case law has shown, because you don't recall making the statements, does not create an issue of fact. So we submit that Mr. Yazdien has mischaracterized the situation where he argues that the written warning was his first ever discipline. The record reflects that he had received coaching from Mr. Sweat in emails. And that Conrad believed that he was a problem back in 2008 when Mr. Sweat inherited Mr. Yazdien as a territory manager. He came in from another district. Mr. Sweat took over the district here in Ohio. He was warned that Mr. Yazdien was a challenge to manage. Conrad does not dispute that he delivered sales numbers. I mean, obviously, they put people out in the field and they want them to deliver sales numbers. But when an employee is difficult, he's not guaranteed a job just because his sales numbers are good. But in terms of the retaliation claim, there's the temporal proximity. And your opponent says that the protected activity occurred in June of 2010 through this call to Jackson. And then six weeks later, he's fired. So it looks like there's a prima facie case of retaliation. And then you come back and you say, well, it's because of insubordinate behavior. Is that? Yes. And there was insubordinate behavior during that six-week period? Insubordinate behavior, Your Honor, predates any alleged protected activity. But then doesn't that suggest at least a triable question about whether the cause of the firing six weeks after the protected activity was the protected activity? Because why hadn't you fired him earlier? No, because the temporal proximity, and I understand that the courts are wrestling with this issue. And there's cases that are on point on both sides in terms of, is temporal proximity enough? And the temporal proximity has been shown to be enough in a very isolated case, and that's the Mickey case. And that was when the firing took place on the same day as the protected activity. And in that case, the court said that there was no time for it to be anything but the fact that the person engaged in protected activity. And what's important here is we have to look at temporal proximity after the prima facie case. The courts have definitely held that temporal proximity can be enough in the prima facie case. But here, that's not what happened. And even assuming that we get to, that they've proved a prima facie case, they still have a but-for standard under University of Texas Nassar case. So they have to show pretext. And the temporal proximity here, even if you take the facts in favor of Mr. Yazdian as the June 2010 call as a protected activity, temporal proximity is not enough because they cannot show that he was fired before that reason. All of the record, and it's undisputed, that he had problems and that Mr. Sweat was trying to coach him, and that every time he tried to coach him, he was met with a litany of insubordinate behavior. I mean, the court can see in the record all of the remarks that Mr. Yazdian was making to Mr. Sweat. He became completely... Was there something that triggered the termination that was subsequent to the protected activity? The court below found that when Mr. Sweat called Mr. Yazdian to let him know that the written warning was coming, out of courtesy, Mr. Yazdian, again, went off on a tangent and calling Mr. Sweat all kinds of names and making insulting remarks. And at that time, Mr. Sweat testified that his behavior was so belligerent and hateful that it was at this point in time he knew he couldn't reform and rehabilitate Mr. Yazdian. It was out of control at that point in time. ConMed is a company that has standards of conduct and, obviously, an employee handbook that sets forth. And they felt at that time, and Mr. Sweat made the suggestion at a later date, that Mr. Yazdian, after consultation with Mr. Sweat and HR, should be terminated. He did not have the power to fire Mr. Yazdian on his own. Did HR investigate or did HR take Sweat's viewpoint? No, HR investigated. That was an independent investigation. In fact, they went and called Mr. Yazdian and then went back again because the vice president of HR wanted to make sure that we probed sufficiently into these complaints, which, again, the complaint was a hostile work environment. And back in April of 2010, he had said, you don't like my race in context to the marketing messenger and internal communication of ConMed's article he was writing. Again, I don't think the race comment is even appropriate here to talk about. But the only other vague complaint that he made was to Mr. Sweat about a hostile work environment. Never mentions his national origin or the fact of his religion. Would that be a protected activity, the comments to Mr. Sweat? We submit it's not. We submit it's vague. Under Fox and Booker, we don't think that it is protected activity. However, even if it was protected activity, we don't think that he is still able to connect the protected activity. He still has to show pretext. This is a pretext case, and he cannot show the connection between the alleged protected activity and the termination. He would have been disciplined. He was being disciplined anyway. And his response to that discipline led to his termination. What are we to make of the fact that the plaintiff had a number of years of employment where he got good performance reviews, didn't have any problems, and then seemingly all these problems come about when he's placed with Mr. Sweat? What are we to make of that? Well, I would submit, Your Honor, that the record reflects that ConMed was in a situation where the division that Mr. Yazdian worked for was out of Chelmsford. It was losing money. They were going to shut it down. So they consolidated the districts, and that's when Mr. Sweat came over to this district. Ms. Yazdian had a previous supervisor, and his supervisor, Mr. Werger, who was out of Chelmsford, eventually they closed that office and they were laid off. I believe the 2008 performance evaluation, which was signed by Mr. Sweat in March of 2009, so it was really for the prior year. I think counsel mischaracterizes that it was a 2009 performance evaluation. It was really for the year 2008, and Mr. Sweat had been his supervisor for a couple of months. And while ConMed does not dispute, again, that he was delivering good sales numbers, with the crisis of trying to get this division on the right track and Mr. Sweat coming in, there was probably more oversight of the salespeople at that time that Mr. Yazdian was not previously exposed to. You know, salespeople are out on the field. They don't come into an office, and there's not a lot of oversight, physical oversight. So trying to drive the numbers up and to make sure that the district was doing what it was doing, I believe Mr. Sweat was more oversight of his salespeople. And there certainly was a personality conflict. I don't think that that's in dispute, but Mr. Sweat's his supervisor, and Mr. Sweat also made an affirmative statement, which is in the record, that when he came to the Ohio District at the end of 2008, that he was willing to coach Mr. Yazdian because other supervisors were saying that he was difficult to manage. And he said, no, let me work with him. I'll work with him. And so he was trying to get him to be a better salesperson. And in that performance evaluation, which is in the record, it shows that Mr. Sweat made comments that his demeanor and tone were not appropriate and that he had issues with internal communications. And as early as April 2009, he was coaching him and telling him that he was creating discord within the sales team. So not everybody works well together, Judge. I mean, I think that's a fact. We all work with other people and certain people get along and certain people don't, but it's your supervisor. And if your supervisor is instructing you to act a certain way and you're resisting that, that's not uncommon. All right. I do want just to mention with the couple minutes I have left that the credibility issue, since counsel brought it up, I do not think that Judge Beckwith made any credibility determinations in this case. Again, if you look at the record, I do not think there's any conflicting testimony here. And the judge has viewed the evidence in the light most favorable to the plaintiff, which is appropriate on summary judgment, and Mr. Yazdian has not denied making any of the statements and that the reason that was given by ConMed never changed throughout the process and he cannot show that the legitimate reason that ConMed gave for his termination was false. Unless there's any other questions. Apparently not. Thank you. Thank you. Page 21 of the district court's opinion, as the judge is dismissing whether there's evidence of protected activity and a causal connection, the court writes, In the phone call, plaintiff did accuse Sweatt of creating a hostile work environment. But as ConMed points out, Sweatt testified that it was not the content of plaintiff's statements that led to his recommendation to terminate, but rather the belligerent and hateful manner in which he responded to the notice of the warning letter. If that's not viewing the evidence in the light most favorable to the defendant or weighing the evidence, how is that an objective inquiry crediting Mr. Sweatt's tone or Mr. Sweatt's description of the tone as evidence to prove Mr. Yazdian wasn't engaging in protected activity or that it didn't matter? I mean, that's a classic example of making a credibility determination. Mr. Sweatt is saying, oh, I wasn't really paying attention to the fact that he was accusing me of a hostile work environment. It was the way he said it. I mean, that's completely dangerous to the protections afforded individuals under Title VII to allow a supervisor who's being accused of discrimination and harassment to say, well, it's the way you said it. It's the same thing with Mr. Sweatt characterizing Mr. Yazdian's behavior as insubordination. You know, it's quite common when a supervisor is being accused of misconduct, they're going to try to turn it around against the employee and say, well, he's just insubordinate. He's not coachable because he disagrees with how he's being treated. You know, there really is clear evidence of contradictory testimony in this record that's significant. For example, Mr. Sweatt claimed that he had made Mr. Jackson, his boss, aware of discrimination complaints previously. Jackson denied that in his testimony. That's at page 1629 and 1705 of the record. Judge Moore, I read your dissent in the Thrash v. Miami University case last year where you talked about the overuse of summary judgment. And this is a classic example of the district court not giving Mr. Yazdian the benefit of all reasonable inferences he's entitled to. There's clear evidence which a jury could reject their contention that he's a longstanding problem. Would you agree, though, that there's some evidence about which there's no dispute as to Mr. Yazdian being insubordinate? He's criticizing Mr. Sweatt's management style and, you know, any number of the things I would think would be viewed by anyone as insubordinate. Well, I think the difference in where the district court got it wrong is they're saying Mr. Yazdian admitted the conduct. Well, what he admitted was, or didn't dispute, were a number of statements that were attributed to him in that July 13th call. He didn't deny those. But you can't divorce those in analyzing a case at summary judgment from the totality of the circumstances, which is he did engage in protected activity in that call, and Sweatt says that's the reason he fired him. But yet he wants, as a matter of law, it wasn't that he was complaining about a hostile work environment. It was his belligerent tone. So is there some evidence in the record where you could say, well, he got this email in April of 2009 that was critical of his communication style? Yeah, but there are a hundred emails praising Mr. Yazdian for his good work performance. If this guy was such a problem, if he was insubordinate, where is that in the record prior to his written warning given to him on July 13th? So the district court on page 7 in footnote 4 has a bunch of statements that the district court says Sweatt's journal notes that your client made these statements. And my understanding from then reading on in the district court opinion is that the plaintiff testifies he doesn't recall making many of the statements, but am I correct that he doesn't deny making those statements? Right. My understanding of footnote 4, those are plaintiff's statements in the July 13th phone call. And so, yes, he does not deny making a number of these statements. But I think a jury could be entitled to view that in the context of what's been going on in this case, which is six weeks earlier Mr. Yazdian called his boss's boss to ask for a transfer and say, I'm being discriminated against. And then all of a sudden he gets this written warning from Mr. Sweatt. So certainly a jury could believe Mr. Sweatt on the stand and say, okay, it was the belligerent tone. But as a matter of law, at summary judgment, you can't credit that Sweatt's description of the call as evidence. The evidence has to be viewed in favor of the non-moving party. Thank you. Okay. Thank you, counsel, for your arguments today. We really do appreciate them. The case will be submitted. There being no further questions.